[Cite as *In re J.C.*, 2023-Ohio-778.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| [J.C., | : | No. 22AP-259 (C.P.C. No. 19JU-3647) |
| W.P., Father, | : | |
| Appellant]. | : | |
| In re: | : | No. 22AP-260 (C.P.C. No. 18JU-9448) |
| [L.C., | : | |
| W.P., Father, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| | : | |

D E C I S I O N

Rendered on March 14, 2023

**On brief:** *William T. Cramer*, for appellant W.P., father.

**On brief:** *Boller & Petty LLC*, and *Kelley G. Boller*, for L.C.

**On brief:** *Robert McClaren*, for appellee Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Division

BOGGS, J.

{¶ 1} Appellant, W.P., appeals from the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting appellee's, Franklin County Children Services ("FCCS"), motion for permanent custody of L.C. and J.C. For the following reasons, we affirm in part, and reverse and remand in part.

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2}   This case concerns two children, a boy named J.C. born in June 2008 and a girl, L.C., born in April 2014. W.P. is J.C.'s father and L.C.'s putative father.  J.C.'s mother has been deceased since 2013.

{¶ 3}   In August 2018, the police found L.C.'s mother beating her in the front yard, which caused her to sustain bruises on her head and chest, abrasions on her arm, leg and knee, and bleeding on her upper lip.  L.C.'s mother was arrested and charged with domestic violence, assault, and child endangering.

{¶ 4}   On August 14, 2018, L.C. was placed into the emergency custody of FCCS. The next day she was placed into the temporary custody of FCCS.  On November 6, 2018, L.C. was adjudicated to be an abused, neglected, and dependent child.  L.C. was placed with W.P. who also had custody of J.C. at the time.

{¶ 5}   In December 2018, the FCCS case plan indicated that L.C.'s mother needed to complete numerous objectives that included, but not limited to: maintaining stable housing and legal income, completing random drug screens, completing a substance abuse assessment and any recommended treatment, taking a domestic violence assessment, and working with a parent mentor. W.P.'s list of objectives included, but not limited to: maintaining stable housing and income, completing a domestic violence assessment, demonstrating that he can meet the educational and medical needs of the children, and attending all visits with the children.

{¶ 6}   In March 2019, W.P. was arrested on charges of domestic violence and assault.  On June 7, 2019, J.C. was adjudicated abused, neglected, and dependent and placed into the emergency custody, and shortly thereafter temporary custody, of FCCS.  In August 2019, FCCS filed a motion to terminate father's temporary custody of L.C. and grant custody to C.T., who is W.P.'s adult son.  By December 2019 a report from the children's

Guardian ad litem ("GAL"), indicated that C.T. would rather not take custody of L.C. and was overwhelmed in taking care of both J.C. and L.C., as well as his own children.

{¶ 7} On January 10, 2020, FCCS filed a motion for permanent custody of L.C., and on February 2, 2020 filed a motion requesting permanent custody of J.C.

{¶ 8} An initial hearing was set for February 12, 2020 but was first continued by FCCS until March 18, 2020. The case was again continued on March 18, 2020 due to the beginning of the COVID-19 pandemic and the court suspending business until May 13, 2020. On May 11, 2020, the court sua sponte delayed the hearing again until August 12, 2020. FCCS requested a continuance to perfect service on August 11, 2020, and the hearing was then set for September 16, 2020. On September 16, 2020 FCCS requested a continuance to perfect service and the hearing was then set for October 14, 2020. The case was continued again until December 7, 2020 in order to appoint counsel for W.P.

{¶ 9} In January of 2021, J.C. and L.C. were placed together in a foster home.

{¶ 10} On January 25, 2021, W.P. and L.C.'s mother requested a continuance which then set proceedings for March 24, 2021. The case was again continued until April 28, 2021, at the request of the GAL and on that date W.P. and L.C.'s mother requested another continuance for June 23, 2021, which was granted.

{¶ 11} By June 2021, J.C. had been moved to a behavioral health facility in Cleveland for repeated violent and destructive behaviors.

{¶ 12} On June 23, 2021, the parties requested another continuance and moved the proceedings to November 8, 2021.

{¶ 13} Just before the beginning of trial, on November 8, 2021, W.P. requested a continuance as he was incarcerated for a violation of probation and could not attend the hearing in person. W.P.'s attorney requested the hearing to be rescheduled for a date after

W.P.'s possible early release in March 2022, or in the alternative, he indicated W.P.'s willingness to participate via teleconference from prison if there was time for it to be arranged, which could take several weeks.

{¶ 14} The court, however, denied W.P.'s request for continuance stating that the permanent custody motions had been pending for nearly two years and that both children needed permanency. The court also noted that there had been numerous continuances delaying proceedings for over a year, that W.P. had been represented by counsel during the proceedings since November of 2019, and that counsel was familiar with the case.

{¶ 15} At trial, J.C. and L.C.'s foster parent T.M. testified that the siblings are very bonded with each other. (Nov. 8, 2021 Tr. at 36.) T.M. expressed a desire to foster both siblings, and she testified that she would welcome J.C. back in the foster home following his treatment at the behavioral health facility. *Id.* at 33-35.

{¶ 16} The GAL for J.C. and L.C. testified that L.C. wished to remain with and eventually be adopted by her foster family. (Nov. 19, 2021 Tr. at 21.) The GAL also testified that J.C. expressed that he wished to be with his father, W.P., and that if he cannot return to his father's home, he would like to be with L.C. in T.M.'s foster home. *Id.* at 22.

{¶ 17} In reviewing both case plans for L.C.'s mother and W.P., the court found that neither of them appeared ready to take care of J.C. or L.C. within a reasonable period of time. Both parents failed to meet several objectives of their case plans including finding stable housing, demonstrating legal income, and being able to demonstrate they could meet the medical and educational needs of J.C. and L.C. In considering placement alternatives, FCCS was unable to identify any kinship options who were able and willing to take custody of the children.

{¶ 18} The court also noted that at the time L.C. was placed in T.M.'s foster home, L.C. was very small for her age, had mood swings, and sleep issues including nightmares and bed wetting. She also expressed fear of others and was behind educationally. These issues have improved since she was placed with T.M. who has arranged for L.C. to have counseling and attend a new school. The court stated that L.C. is in a "place where she is loved, cared for, and supported; a home where all her needs are met." (Mar. 29, 2022 Jgmt. at 20.)

{¶ 19} J.C. was moved from the foster home with L.C. due to behavioral issues that existed in a previous foster home placement. J.C. would threaten other children in the home, kick furniture and punch holes in the walls. T.M. testified that she would welcome J.C. back into her home following his treatment, and that she would be open to adopting him if he would continue to be eligible to receive all the necessary services. (Nov. 8, 2021 Tr. at 33-35.)

{¶ 20} Ultimately on March 29, 2022 the trial court granted FCCS permanent custody of both J.C. and L.C. On April 26, 2022 father timely filed this appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 21} Appellant assigns the following as trial court errors.

> [1.] Father's Due Process right to have meaningful input during the permanent custody trial was violated when the trial denied a motion to continue until father was released from prison or until counsel could arrange a video conference.

> [2.] Father was deprived of his right to the effective assistance of counsel under the Ohio Constitution, R.C. 2151.352, and Juv.R. 4(A) when counsel failed to secure father's meaningful participation in the permanent custody trial.

## III. LEGAL ANALYSIS

{¶ 22} We now consider W.P.'s first assignment of error. W.P. argues that his due process rights were violated when the trial court denied his request for a continuance. W.P. asked this matter to be continued until March of 2022, when he *anticipated* his release from prison. In the alternative, W.P. requested a continuance for time to arrange a videoconference.

{¶ 23} Parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio has recognized the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). These rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Thus, in certain circumstances, the state may terminate the parental rights of natural parents when it is in the best interest of the child. *In re E.G.,* 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694, 2000 Ohio App. LEXIS 4550 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 24} A trial court may grant permanent custody if it determines by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1), " 'such relief is in the best interests of the child.' " *In re G.E.H.,* 10th Dist. No. 15AP-966, 2016-Ohio-3535, ¶ 52, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 9. On appeal, we will not reverse a trial court's decision in a permanent custody case unless it is against the manifest weight of the evidence. *In re I.R.*, 10th Dist. No. 04AP-1296, 2005-Ohio-6622, ¶ 4, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. Judgments in permanent custody proceedings are not against the manifest weight of the evidence "when all material elements are supported by competent, credible evidence." *J.T.* ¶ at 8.

{¶ 25} Here, W.P. does not argue that the trial court's decision was against the manifest weight of the evidence, but rather he argues that the trial court's denial of his continuance request violated his due process rights. An appellate court will not reverse a denial of a continuance in a permanent court commitment case, or a decision to proceed at trial in the absence of an incarcerated parent, absent an abuse of discretion. *In re J.B.*, 10th Dist. No. 08AP-1108, 2009-Ohio-3083, ¶ 26, citing *In re B.G.W.*, 10th Dist. No. 08AP-181, 2008-Ohio-3693, ¶ 23; *In re Ang.O.*, 6th Dist. No. L-18-1161, 2018-Ohio-5195, ¶ 17. An abuse of discretion connotes a decision that was unreasonable, arbitrary, or unconscionable. *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, ¶ 19 (plurality opinion), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 26} In reviewing whether a trial court abused its discretion in denying a continuance, an appellate court weighs any potential prejudice to the movant against the court's right to control its docket and the public's interest in the efficient dispatch of justice. *State v. Woods*, 10th Dist. No. 09AP-667, 2010-Ohio-1586, ¶ 24; *In re M.K.*, 10th Dist. No. 09AP-1141, 2010-Ohio-2194, ¶ 14. A court should consider: (1) the length of the requested delay, (2) whether the parties have requested and received other continuances, (3) the inconvenience to the parties, witnesses, opposing counsel, and the court, (4) whether the requested delay is for legitimate reasons or is merely dilatory, purposeful, or contrived, (5) whether the movant contributed to the circumstances giving rise to the request for a continuance, and (6) any other relevant factors, depending on the unique circumstances of each case. *Woods* at ¶ 24, citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981); *J.B.* at ¶ 26. Additionally, as to an incarcerated parent that does not attend a permanent custody hearing, it is well-settled that the parent's due process rights are not violated when the parent is represented at the hearing by counsel, a full record of the hearing is made, and

any testimony that the parent wishes to present could be presented by deposition. *Ang.O.* at ¶ 17.

{¶ 27} Here, we do not find that the trial court's denial of W.P's continuance request is an abuse of discretion. By the time trial began in November 2021, approximately ten continuances had been granted. J.C. had been in the care of FCCS for 32 months and L.C. had been in their care for 39 months. The permanent custody motions had been pending for both children for nearly two years—well past the statutory deadline over 120 days after the filing of the permanent custody motion. *See* R.C. 2151.414(A)(2). The trial court's decision to deny the continuance was not an abuse of discretion or unreasonable, arbitrary, or unconscionable. Rather the trial court acted well within its discretion by weighing the potential delay of proceedings to accommodate W.P.'s participation and the need for J.C. and L.C. to find resolution and permanency. For these reasons, we overrule W.P.'s first assignment of error.

{¶ 28} We now turn to W.P.'s second assignment of error regarding ineffective assistance of counsel. Under R.C. 2151.352, a parent "is entitled to representation by legal counsel at all stages of the proceeding" terminating their parental rights. In addition to the statutory right, the right to counsel "also arises from the guarantees of due process and equal protection contained within the constitutions of Ohio and the United States." *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 24, citing *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6 (1980), paragraph two of the syllabus ("In actions instituted by the state to force the permanent, involuntary termination of parental rights, the United States and Ohio Constitutions' guarantees of due process and equal protection of the law require that indigent parents be provided with counsel."). "Parents who are parties in proceedings involving the termination of parental rights are entitled to the effective assistance of

counsel."  *In re C.P.*, 10th Dist. No. 08AP-1128, 2009-Ohio-2760, ¶ 56, citing *Brooks* at ¶ 24.

**{¶ 29}** "The test for ineffective assistance of counsel used in criminal cases, announced in *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody." *Brooks* at ¶ 24, citing *In re McLemore*, 10th Dist. No. 00AP-974, 2001 Ohio App. LEXIS 1249 (Mar. 20, 2001).  *Strickland* requires that appellant first show counsel's performance was deficient.  To meet that requirement, appellant must show the parent's attorney made errors so serious "that counsel was not functioning as the 'counsel' as guaranteed the defendant by the Sixth Amendment."  *Id*. at 687.  In addition, appellant must show that counsel's deficient performance prejudiced the parent's case. To meet the second requirement, appellant must show that counsel's errors "were so serious as to deprive [them] of a fair trial, a trial whose result is reliable." *Id*.  In effect, appellant must show that there is a "reasonable probability" that, but for counsel's errors, the result of the trial would have been different.  *Id*. at 694.

**{¶ 30}** Here, we find that W.P.'s counsel's performance fell below an objective standard of reasonableness.  The date of trial was set five months in advance, giving his counsel ample time to request a continuance or to plan for his participation remotely. Instead, counsel waited until the day of trial to request a continuance so W.P. could participate.

**{¶ 31}** After denying the request for a continuance, the trial court judge made clear that W.P. would be permitted to join by videoconference should arrangements be made for the next day, or presumably if they could not make videoconference arrangements the court would accept an affidavit from him.  (Nov. 8, 2021 Tr. at 11-12.)

{¶ 32} On the second day of trial, W.P.'s counsel reported that it would take several weeks to arrange for a videoconference but there is no evidence in the record to suggest that counsel took any steps to obtain his testimony through an affidavit. The record indicates that there was sufficient time for counsel to, at the very least, obtain testimony via deposition or an affidavit prior to the conclusion of trial. The first two days of trial took place on November 8 and 9, 2021, but then there was a period of ten days before the trial resumed for its last day.

{¶ 33} Permanent custody orders have been reversed even when parents have been involved in the proceedings if the court finds that their involvement did not constitute meaningful participation. For example, when counsel only submitted a basic questionnaire filled out by a parent, the court found that counsel's failure deprived the mother of a meaningful opportunity to participate in the hearing, resulting in a fundamentally unfair trial. *In re S.A.*, 2d Dist. No. 07-CA-110, 2008-Ohio-2225. Likewise, counsel's submission of several letters as the only participation by the parent in a permanent custody hearing did not constitute meaningful participation. *In re Roque*, 11th Dist. No. 2005-T-0138, 2006-Ohio-7007.

{¶ 34} Counsel was also deemed ineffective by failing to protect a parent's right of meaningful participation in a permanent custody hearing after failing to arrange for an incarcerated father to be transported to the hearing or facilitate participation by some other means. *In re K.T.*, 9th Dist. No. 14 CA 010646, 2015-Ohio-2304. There, the Ninth District found that counsel was ineffective *and* that the incarcerated father was prejudiced by counsel's deficient performance. *Id.* The court noted that the father's testimony would have offered an alternative placement, potentially changing the result of the hearing. *Id.* at ¶ 23.

{¶ 35} In the case of W.P.'s counsel, there was ample time for counsel to arrange for him to meaningfully participate—either through videoconferencing, affidavit, or deposition, especially when it became clear that there would be ten days between the second and third day of trial.

{¶ 36} We now turn to whether counsel's deficient performance resulted in prejudice for father or if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Ballew*, 76 Ohio St.3d 244, 257 (1996).

{¶ 37} Here we find that there is sufficient probability to undermine confidence in the outcome of trial as it relates to permanent custody for J.C.. It is clear that W.P. and J.C. are deeply bonded and that J.C. has consistently wanted to return to his father's custody. As W.P. states in his brief, he "is the only parental figure that J.C. has ever known and J.C. had no behavioral problems when he was with his father * * *. J.C. has consistently desired to be returned to father." (Appellant's Brief at 28.)

{¶ 38} W.P.'s testimony had his counsel arranged for it and if found credible, would have been helpful in determining permanency for J.C. given that W.P. was only months away from his possible release. W.P.'s testimony would have allowed him to address any concerns regarding noncompliance with portions of the FCCS case plan, and provide insight into how he intends to comply with the case plan in the future.

{¶ 39} Furthermore, W.P. is one of the few options J.C. has to find permanency. While T.M. testified that she would be willing to welcome J.C. back into her foster home, it was not a home in which he was thriving. J.C. exhibited destructive and violent behavioral issues while he was under the care of T.M. in the foster home. His behavioral issues and the safety of the other children in the home must be addressed first. These circumstances

make J.C.'s permanent placement back with L.C. in the foster home more difficult and precarious.

{¶ 40} While we find resulting prejudice in the permanent custody of J.C., the same cannot be said for L.C., who wishes to remain with her foster family and to ultimately be adopted.

{¶ 41} Unlike with J.C., appellant is L.C.'s putative father, with L.C.'s mother confirming that there are other possibilities for L.C.'s biological father. It is also clear that L.C. is improving while under the care of her foster family. She has bonded with the other children in the foster home, is improving at school, and is addressing behavioral issues such as bedwetting, nightmares, and sleepwalking through continuing therapy.

{¶ 42} Unlike J.C., L.C. does not want to be placed back with W.P. Since L.C. is not in a behavioral treatment facility, she would be able to more immediately benefit from a permanent custody arrangement. Given these circumstances, we are not persuaded that counsel's failure to obtain W.P.'s testimony or timely arrange participation by videoconferencing rises to the level of sufficient probability of undermining the outcome of trial for custody of L.C.

{¶ 43} Under these circumstances, we find W.P. has shown ineffective assistance of counsel and resulting prejudice regarding J.C. but not L.C.

**IV. CONCLUSION**

{¶ 44} For these reasons, in case No. 22AP-260, we affirm the trial court's judgment awarding permanent custody of L.C. to FCCS. In case No. 22AP-259, we reverse the trial court's judgment awarding permanent custody of J.C. to FCCS and remand this matter to the trial court. On remand, the court shall (1) vacate its March 29, 2022 judgment only as it pertains to J.C.; (2) retain jurisdiction over J.C.; (3) appoint new counsel for W.P. so he

may pursue his right to meaningfully participate in the hearing and allow the trial court an opportunity to assess W.P.'s testimony for credibility; and (4) conduct a new hearing as to the custody of J.C. and consider evidence already presented as well as supplemental and new evidence admitted after remand.  Finally, we are sensitive to the concern that courts expeditiously process the cases of children and parents so that they are not left in legal limbo for months and even years, we instruct the lower court to act promptly on remand and to proceed consistent with this decision.

*Judgment affirmed in part and reversed in part; remanded with instructions.*

DORRIAN and JAMISON, JJ., concur.

————————————